UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

In re: }
}
PEGGY SUE EMERY, } Case No. 13-41769-JJR7
}
Debtor. }

## OPINION AND ORDER

At the commencement of this case, attorney Dana Jill Simpson ("Simpson") represented the debtor, Peggy Sue Emery ("Emery"). While the case was pending, it appeared Simpson had abandoned Emery, and another attorney stepped in on a pro bono basis and guided Emery to a discharge. As a consequence of Simpson's failure to adequately represent her client, her failure to respond to the Court's notice to show cause why she should not be sanctioned, and her failure to appear at the hearing on the show cause, the Court suspended Simpson's privilege to practice in the U.S. Bankruptcy Court for the Northern District of Alabama.[1] This matter is now before the Court on Simpson's motion (Doc. 42) in which she seeks reinstatement to practice. A hearing was held at which Simpson, her husband, and Simpson's long-time secretary and only employee, Marie Shelby ("Shelby") testified. Each also submitted an affidavit in support of Simpson's motion (attached to Doc. 42).[2] Robert J. Landry, an Assistant Bankruptcy Administrator, also appeared at the hearing.

---

[1] *See In re Gleason*, 492 Fed. Appx. 86 (11th Cir. 2012); *cert. denied*, 2013 U.S. Lexis 2633 (U.S. April 1, 2013) (A bankruptcy court has inherent authority, in addition to statutory authority under 11 U.S.C. § 105, to sanction and suspend an attorney practicing before it.).

[2] The affidavits, or at least their notarizations, have raised additional issues. *See* note 14, *infra*.

1

Jurisdiction:

This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the General Order of Reference, as amended, entered by the United States District Court for the Northern District of Alabama. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); therefore, the Court has authority to enter a final order. The following shall constitute the Court's findings of fact and conclusions of law.

Simpson Hires Shelby:

It could be said that the circumstances leading to Simpson's suspension got their start 25 years ago when she hired Shelby, a nonlawyer, to work in her law office, and culminated with the events that took place during the past several months. Shelby's duties included those commonly performed by a secretary, receptionist, bookkeeper, office manager and even a paralegal, none of which is unusual in a one-lawyer office.[3] What was unusual, however, was the lack of professional oversight and review of Shelby's work, at least with respect to Simpson's bankruptcy practice during the timeframe examined in this opinion. Shelby was allowed to unilaterally make decisions that should have been made by a lawyer, draft and file documents with courts – at least the bankruptcy court – without Simpson's knowledge or review, and by default, controlled which electronic bankruptcy court notices were printed and brought to Simpson's attention. After considering all the evidence, the Court is convinced Shelby knew more about Simpson's bankruptcy practice than Simpson did.

Shelby was a family friend and before going to work for Simpson she worked for Simpson's parents. About five years ago Simpson should have been alerted that Shelby could be

---
[3] Shelby was also a creditor to whom Simpson owed almost $16,000. *See* note 6, *infra*.

irrational and did not always act responsibly when Shelby signed for a certified mail envelope from the State Bar that contained a complaint filed against Simpson. Shelby took the letter and simply "put it in a file" without telling Simpson. (Simpson aff., attached to Doc. 42.)[4] Simpson later discovered the cover-up, and the complaint was resolved. (*Id.*) This episode was a harbinger of worse things to come.

Electronic Court Filing and Noticing:

The U.S. Bankruptcy Court for the Northern District of Alabama, with few exceptions, requires all pleadings and other documents filed by attorneys to be filed electronically through CM-ECF, i.e. case management – electronic case filing system. And notices from the Court and clerk's office are sent via the Internet to the email addresses designated by lawyers. Nonlawyers employed by law offices may utilize CM-ECF, which is not unusual, but the privilege to access CM-ECF belongs to the lawyer, and the responsibility for its proper utilization may not be delegated. Lawyers are charged with receipt of all email notifications from the Court and clerk's office, whether they personally review those notices or not.

In regard to Simpson's bankruptcy practice, and in particular her utilization of CM-ECF and electronic court noticing, the Court is convinced that Simpson relied exclusively on Shelby to perform all electronic filing, and to receive and review all electronic notices from the Court and clerk's office. According to Simpson, she had taken the required training for electronic court noticing and filing; however, the evidence revealed that she deferred to Shelby to file documents electronically, and print hard copies of notices *Shelby* decided Simpson should read;

---

[4] At the time of this incident, Shelby's husband was ill, although no connection was ever established between his illness and Shelby's hiding the bar complaint from Simpson.

3

if electronically transmitted court notices were not printed, Simpson never saw them – at least with respect to the instances discussed below.

### Emery's Bankruptcy Case – Part One:

On October 3, 2013, Simpson filed a chapter 7 bankruptcy case for Emery. The initial meeting of creditors held pursuant to § 341 of the Bankruptcy Code was scheduled for November 1, 2013, the same date Simpson was to appear in state court. She asked another attorney to cover the creditors' meeting so she could attend state court. Simpson testified that having a substitute attorney appear at a 341 meeting was routine practice when the attorney retained by a debtor could not attend, and she stated this practice was once encouraged by a trustee. (That practice is neither encouraged nor condoned by this Court.)[5] Shelby attended the meeting for the purpose of delivering Emery's file to the stand-in lawyer, but Emery failed to attend. For whatever reason, or perhaps for no reason, Shelby lied and told Simpson that Emery had attended the meeting. The 341 meeting was rescheduled for November 15, 2013, and Shelby – without Simpson's knowledge – asked the same substitute lawyer to cover the rescheduled meeting. Emery again failed to appear, and the trustee filed a motion to dismiss the case. The trustee's motion to dismiss was set for a hearing on January 9, 2014. Notice of the hearing was

---

[5] The Court does not know whether Simpson's statement was accurate regarding a trustee encouraging retained lawyers to send substitute counsel, rather than ask for a continuance of creditors' meetings, when the retained lawyer had a conflict. Regardless, such a practice would not be condoned by this Court or any other bankruptcy court of which this judge is aware. In fact, such a practice is risky and could result in malpractice unless, with the debtor's permission, the substitute lawyer is made aware of all aspects of the debtor's case and meets with the debtor and her retained counsel beforehand to discuss what questions are likely to be asked and go over any issues specific to the debtor's circumstances. Otherwise, a debtor will be examined under oath about matters of which the substitute lawyer has little or no knowledge, including those which might pertain to the debtor's eligibility for a discharge, dischargeability of specific claims, exemptions, or even matters with criminal implications. In Emery's case, Shelby took the file and met the stand-in lawyer at the meeting, and it was apparent Emery was never informed she would be represented at the meeting by another lawyer, much less asked whether she consented to the substitution, and there was no preparatory meeting among Simpson, Emery, and the substitute lawyer.

sent electronically to Simpson's office, but Shelby did not tell Simpson about the hearing and Simpson did not personally review her notices from the Court.

<u>Complications – Personal Bankruptcy, Marriage, Honeymoon, Surgery, California</u>:

While all this was going on, Simpson's personal life was becoming especially complicated, possibly distracting her from her professional responsibilities. To start with, on June 9, 2013, Simpson herself became a bankruptcy debtor when she filed a chapter 13 case in this Court (case no. 13-41142-JJR13). A few months later, on November 15, 2013, she was married at an out-of-town wedding held in Gatlinburg, Tennessee, and that was followed by an extended honeymoon in Europe. Simpson was out of the country from around November 15, 2013 through January 5, 2014. Unfortunately, she injured her neck on the trip back home, and was advised by her doctor to limit her movement to avoid further injury while awaiting surgery, which was conducted on January 23, 2014. Simpson was, for the most part, bed-ridden after her injury and during her recovery after surgery, and took up residence in the back of her law office. Simpson's recovery lasted through early April 2014, when she began returning to state court.

On July 1, 2014, about three months after her recovery from surgery, Simpson sent a letter to the state courts in which she practiced and to the local bar, announcing that she would be absent from her law practice on July 11 and August 1, 2014, and "intermittently . . . beginning August 7, 2014 through May 18, 2015 . . ." to attend graduate school classes in Berkeley, California. (attachment to Doc. 42.)

Chapter 13 Payments:

Soon after her return from the extended honeymoon, Simpson filed a motion seeking a reduction in the amount of her chapter 13 payments. (Doc. 64 filed in Simpson's personal case on January 24, 2014).[6] As grounds for the reduction, the motion mentioned Simpson's surgery, her absence from work, a decrease in her clientele, and a fire at her place of business. The motion was supported by amended Schedules I and J (Doc. 65 filed in Simpson's personal case – disclosures of income and expenses). In Part 1 of amended Schedule I – wages and income disclosures – Simpson inserted a simple "N/A" for her spouse's information. "N/A" is an abbreviation for "not applicable" and indicated she was not married.[7] Indeed, that was how her original schedules read before her marriage.

The motion seeking a reduction in chapter 13 plan payments did not mention Simpson's recent marriage or her European travels, and it is doubtful that the chapter 13 trustee or any creditors knew about them. Thus, no objection was filed, the motion was granted, and the payments were reduced.

In her current motion in which Simpson is seeking reinstatement to practice, she does not mention her personal bankruptcy case, and under different circumstances, the Court would not raise it either. After all, people of all walks of life, including lawyers, can become overburdened with debts and find themselves in need of bankruptcy relief. But in this instance, the Court must

---

[6] In her personal bankruptcy schedules, Simpson listed 44 nonpriority unsecured claims totaling $202,968.94. The motion to modify her plan proposed to reduce monthly payments from $2,039 to $1,392, which she stated will pay 5% of those claims. Most of the plan payments go toward paying priority tax claims, real estate mortgages and an auto title loan.
  Simpson listed Shelby as one of her nonpriority unsecured creditors with two claims totaling $15,879, each for an "account" incurred in February 2011. (Doc. 1, Schedule F, filed in Simpson's personal bankruptcy case.) Shelby did not file a proof of claim in Simpson's case; therefore, she is not receiving payments under Simpson's plan.

[7] "n/a – definition . . . not applicable: used on forms when the form requests information or asks a question that is not relevant to you". MACMILLAN DICTIONARY, http:// www.macmillandictionary.com/dictionary/american/n-a (last visited Nov. 10, 2014); *see also* BLACK'S LAW DICTIONARY 1048 (8th ed. 2004).

Case 13-41769-JJR7    Doc 53    Filed 11/20/14    Entered 11/20/14 15:56:28    Desc Main
Document      Page 6 of 18

consider Simpson's good faith and credibility in deciding whether to allow her to once again practice before this Court, and for that reason the Court cannot turn a blind eye to the incongruity that is glaring when Simpson's lengthy European honeymoon and multiple trips to California are juxtaposed with her motion to reduce her chapter 13 payments.

For a financially distressed debtor, such as Simpson, the benefits of chapter 13 bankruptcy relief are extraordinary, and include the ability to preserve assets by way of exemptions and extended payment of secured debts, a respite from creditors' collection efforts and litigation, and ultimately a discharge from financial burdens with a fresh start. But that relief comes with a price: During the term of a chapter 13 case, a debtor is expected to limit her expenditures to those that are reasonably necessary for her and her dependents' maintenance and support, and commit her disposable income – what's left after paying for those necessities – to the repayment of creditors. This *quid pro quo* is codified at 11 U.S.C. § 1325(b) for plan confirmation purposes. It is contrary to both the spirit and the letter of the Bankruptcy Code for a chapter 13 debtor to expend her income on non-essentials while paying only a small percentage to her creditors – Simpson's plan pays unsecured creditors 5%. Another bankruptcy court said it well:

> The Code requires a meaningful and realistic budget, accompanied by the devotion of most of the debtor's surplus income to repay creditors. Chapter 13 debtors are not required to adopt a totally spartan existence; neither are they permitted to continue an extravagant lifestyle at the expense of creditors. Courts apply § 1325(b) to allow debtors to maintain a reasonable lifestyle while simultaneously insuring they make a serious effort to pay creditors by eliminating unnecessary and unreasonable expenses. This section contemplates some sacrifices or alteration in prepetition consumption levels by Chapter 13 debtors, while allowing them to sustain basic needs not related to their former lifestyles.

*In re Gleason*, 267 B.R. 630, 633 (Bankr. N.D. Iowa 2001) (citations omitted). *See also Witcher v. Early (In re Witcher)*, 702 F.3d 619 (11th Cir. 2012) (for chapter 7 debtors, aside from the

7

means test which allows deduction for secured debt whether or not necessary, court may consider ability to eliminate luxury expenses and pay unsecured creditors in chapter 13 as part of the totality of circumstances in determining whether the case is an abuse); *In re Hicks*, 2011 WL 2414419 (Bankr. N.D. Ala. 2011) (finding lack of good faith in chapter 13 plan that paid for unnecessary vehicles and inflated household expenditures at the expense of unsecured creditors). It appears likely that Simpson's expenses (and perhaps her husband's) for travel to Europe were paid at the expense of her unsecured creditors, and the same can be said about her California trips.[8]

Emery's Bankruptcy Case – Part Two:

Now return to Emery's bankruptcy case that was filed by Simpson. Emery appeared at the January 9, 2014 hearing on the trustee's motion to dismiss her case; Simpson did not attend and failed to advise the Court she would not be attending – exactly what you would expect if Shelby did not tell Simpson of the hearing and Simpson was not personally reviewing court-generated notices. Following the hearing, the Court issued an order (Doc. 19) for Simpson to appear and show cause why she should not be sanctioned for failing to appear and represent her

---

[8] Inasmuch as Simpson was a debtor in an active chapter 13 case, the Court asked her to explain how she could afford to travel so extensively in Europe – for 7 weeks. Her response was less than convincing. She explained that she and her husband traveled like students while in Europe. European tours are expensive no matter now economically one travels, and even students have to pay for airfare, food, lodging and local transportation. Moreover, she never satisfactorily explained how she could afford airfare for her several trips to and from California, other than stating she once made the trip by car. And it appeared that her husband was not paying for her or his travel expenses: He testified that he was not employed, was receiving Pell grants for his education, and his only source of income was from the recent sale of a motorcycle.

The motion to reduce payments was granted without objection; however, the trustee would not have known about Simpson's travels, nor did she have an opportunity to inquire about how travel expenses were being paid. The chapter 13 trustee will be informed of this Opinion and Order and the Court assumes she will conduct whatever investigation is appropriate to confirm the reduction in Simpson's chapter 13 payments was justified, or if the reduction is found to be unjustified, the Court further assumes the trustee will seek to increase the payments to at least their original amounts plus whatever may be required to make-up for the undeserved reduction, if that proves to be the case.

8

client. The show cause was set for a hearing on January 23, 2014. On the literal eve of that hearing, Shelby – purporting to be Simpson and without Simpson's knowledge – filed a motion to continue the hearing (Doc. 23). Simpson's surgery, scheduled for the next day, was asserted as grounds for the continuance. The Court – unaware that Shelby was ghostwriting for Simpson – granted the continuance and re-set the show cause for April 3, 2014.[9]

On April 2, 2014, the day before the second show-cause hearing, another motion to continue (Doc. 31) was filed by Shelby, again pretending to be Simpson, reciting that Emery could not appear on April 3rd and that Simpson was undergoing therapy and could not appear. Because the second motion to continue, like the first, was filed on the day before the hearing, it was denied by the Court. The next day, Shelby filed a letter (Doc. 33) in which she attempted to "fall on her sword" and take responsibility for Simpson's neglect. Shelby wrote that she did not tell Simpson about the hearings on the trustee's motion to dismiss Emery's case and the Court's show-cause notice. But while Shelby was willing to admit her transgressions to the Court, she apparently said nothing to Simpson.

The Court conducted the show-cause hearing as scheduled on April 3rd, and Emery *did* appear − contrary to what was stated (by Shelby) in the second motion to continue. However, Simpson did *not* appear.[10] The Court then issued an order (Doc. 36, entered on April 23, 2014)

---

[9] Shelby claimed she just "missed" the January 9, 2014 hearing and did not get it on the office calendar, which simply is not believable. Shelby had already lied about Emery's failure to attend the 341 meeting that led to the January 9th hearing on dismissal of Emery's case, so if Shelby had told Simpson about the dismissal hearing, then her deceit would have been discovered. As for the January 23, 2014 hearing, Shelby claimed to have been motivated by concern for Simpson's well-being, fearing that, in spite of her injury and imminent surgery, Simpson might injure herself if she knew about that hearing and tried to attend. And as for the April 3, 2014 hearing, Shelby's motive was less altruistic; as Simpson said in her testimony, Shelby had "dug too deep a hole" to start telling the truth.

[10] At the hearing on the trustee's motion to dismiss Emery's case, another attorney who was in the courtroom on an unrelated matter overheard the proceedings and realized Emery's plight. With Emery's permission, that attorney agreed to represent Emery on a pro bono basis. At the attorney's request, the trustee agreed to reschedule the 341 meeting for a third time. Emery attended the third-scheduled meeting with her new attorney and was ultimately granted a discharge.

9

suspending Simpson from practicing before this Court until she requested a hearing and showed cause for her reinstatement. In light of Shelby's letter confessing her wrongdoings, including her proclivity for not informing Simpson of court-generated notices, the order suspending Simpson was sent by email to Simpson's personal attorney who represented her in her individual chapter 13 case, in addition to the usual electronic and Bankruptcy Noticing Center notices. We do not know why, but apparently Simpson still did not get word that her law practice had run amuck and, as a consequence, she had been suspended from practice in this Court. According to Simpson, she remained in the dark about her suspension and knew nothing about Shelby's covert activities.

Sometime during the summer of 2014, the Alabama State Bar attempted to contact Simpson via certified mail.[11] True to form, Shelby accepted receipt of the letter and responded to the Bar without Simpson's knowledge. Shelby then hid the Bar's communication at her home rather than leaving it at the office where it might be found by Simpson – not unlike what Shelby had done five years earlier.

### Deception of New Clients:

Although Simpson was suspended from bankruptcy court – a fact known by Shelby, but apparently not by Simpson – she continued to meet with, and counsel clients who were seeking bankruptcy relief, and was retained by at least five of those clients to file their bankruptcy cases. These clients paid Simpson's attorney fees and the filing fees for bankruptcy cases that were never filed. Shelby told Simpson and the clients that the cases had been filed – remember Shelby

---

[11] The Court had the impression the correspondence from the State Bar concerned Simpson's suspension from practicing in bankruptcy court.

was the person in the office who filed cases electronically via CM-ECF. When no notices of the cases and the ensuing 341 creditors' meetings were received, Shelby told Simpson and the clients that the Court was "backed up" and that the hearing dates were being delayed by the Court. Although the clients might not have been suspicious, Simpson should have inquired further, given the time constraints imposed by Bankruptcy Rule 2003(a) on holding meetings of creditors, and that historically this Court had never delayed issuing notices of the commencement of bankruptcy cases or scheduling § 341 creditors' meetings.[12] Nonetheless, Simpson claimed she believed Shelby, and Simpson never investigated the matter further; she never sought verification that at least case numbers had been assigned to the phantom cases because she did not know how to access bankruptcy court files via the Internet and PACER (or if she did, she never tried), nor did she ask other lawyers, including her own, if they had experienced the same delay with their cases.

### Shelby's Belated Confession to Simpson:

Simpson first became aware of her suspension on September 4, 2014 when, purely by happenstance, she examined her incoming mail before Shelby was able to purge it, and saw a letter marked "confidential." Before the letter was opened, Shelby, believing the letter was related to her clandestine activities, confessed all.[13] On September 11, 2014, soon after Shelby's

---

[12] The Court's understanding was that all of Simpson's bankruptcy clients who retained her during her suspension were seeking relief under chapter 7. Bankruptcy Rule 2003(a) states, in pertinent part, that "in a chapter 7 liquidation . . . case . . . a meeting of creditors [pursuant to § 341 shall] be held no fewer than 21 and no more than 40 days after the order for relief."

[13] The letter was unrelated to the matters discussed herein.

confession, Simpson filed a motion (Doc. 42) seeking a hearing on the show cause order and the terms of her reinstatement.[14]

In the weeks since Simpson discovered the actual state of affairs, Shelby has continued to come to the law office in some amorphous capacity, although, according to Simpson, Shelby has not been an "employee" since March 2014.[15] Nonetheless, it appears Shelby still enjoys access to the office and clients' files, and she is helping Simpson become familiar with boxes of files maintained for active cases, which is necessary because Shelby is the only person in the office who knows the status of those cases following Simpson's extended absence from her practice. Simpson claims she refunded the money she took from her putative bankruptcy clients during her

---

[14] As mentioned earlier, there were three supporting affidavits attached to the motion. They had been executed, respectively, by Simpson, her husband, and Shelby. The purported notary on the affidavits, Karen Malone, did not affix her official seal, but did print her commission expiration date as "12-14" which caught the Court's attention: notary commissions always expire on a date certain, not just a month and year. A search of the Secretary of State's online records revealed that Malone's commission in fact expired on August 12, 2014, approximately one month before the affidavits were "notarized." The Court is certain that the omission of the actual month the commission expired was intentional, and had been written as "12-14" to mislead the Court, or whoever read the affidavits, into believing the commission was valid until sometime in December 2014. In any event, Malone was committing a fraudulent act by holding herself out as a qualified notary with an active commission, when she knew she was not, as were any of the affiants who knew, or had reason to know the commission had expired. *Thigpen v. Matrix Fin. Servs. Corp. (In re Thigpen)*, 2004 Bankr. LEXIS 1135 (Bankr. S.D. Ala. 2004). Additionally, a defunct notary willfully performing a notarial act with an expired commission commits a crime: "Any person who, having been a notary, willfully performs or assumes the authority to perform a notarial act, after his or her commission expires, with knowledge that his or her commission has expired . . . shall be guilty of a Class C misdemeanor." Ala. Code 1975, § 36-20-75.
    Simpson testified that she had not noticed how Malone wrote her commission's expiration date on each of the three affidavits; that testimony was not credible. Simpson's signature, and Malone's signature and commission expiration date, appear at the bottom of the last page of Simpson's affidavit. Simpson practiced law for 25 years, and knows how a notary should disclose her commission's expiration date. She should have inquired why the notary was disclosing her commission's expiration in such an unorthodox manner. Moreover, these affidavits were not casual acts; they were submitted to support her request to be reinstated to practice in this Court, and her success in this Court may have repercussions that involve her State law license. If it were not for all the other eccentric, if not bizarre circumstances surrounding Simpson during the time frame examined herein, the Court might not have inquired further about the notary's commission; however, it was just one more peculiarity that begged for further investigation and an explanation. Simpson's explanations become less plausible and more dubious, if for no other reason than the frequency with which they are needed.

[15] Tax returns for the years 2011 and 2012 filed in Simpson's personal bankruptcy case did not show deductions for employee wages, only contract labor, although Simpson and Shelby both testified Shelby was an employee. Both testified that periodic reports were made with federal and state tax agencies with respect to FICA and withholdings from Shelby's salary as an employee. (The last sentence in note 14, *supra*, could be repeated here.)

suspension, with the exception of one client whose name she could not recall. She also claimed to have refunded the fees she charged Emery and also Emery's expenses.

Summary of Events:

The pertinent facts in this matter read like a law office soap opera, sans any humor. A timeline and recap of events lend some organization to the chaos:

(i) Date uncertain – Shelby takes control of bankruptcy court electronic noticing and filing for Simpson's law office;

(ii) June 9, 2013 – Simpson, herself, files chapter 13 bankruptcy;

(iii) October 3, 2013 – Emery's chapter 7 case is filed by Simpson;

(iv) November 1, 2013 – Emery fails to appear at her initial 341 meeting that is attended by Shelby and a stand-in lawyer while Simpson attends state court; Shelby lies to Simpson about Emery's failure to appear;

(v) November 1 – 15, 2013 – Shelby, without Simpson's knowledge, asks the same stand-in lawyer to attend the second setting of Emery's 341 meeting, which he does, but Emery does not; again Shelby does not inform Simpson of Emery's failure to appear;

(vi) November 15, 2013 – January 5, 2014 – Simpson is married in Gatlinburg and immediately leaves for a 7-week European honeymoon;

(vii) December 3, 2013 – the trustee files a motion to dismiss Emery's case; electronic notice of the hearing date is sent to Simpson via e-mail; Shelby fails to inform Simpson (who is out of the country) about the motion or the hearing date;

13

(viii) Early January through early April, 2014 – Simpson is injured while returning from her honeymoon, becomes bedridden and undergoes surgery, followed by recuperation and rehabilitation therapy;

(ix) January 9, 2014 – hearing on trustee's motion to dismiss Emery's case; Emery attends but Simpson does not;

(x) January 13, 2014 – Court issues order and notice for Simpson to appear and show cause why she should not be sanctioned for failing to appear on January 9, 2014, and setting January 23, 2014 as hearing date; electronic notice sent to Simpson via e-mail;

(xi) January 22, 2014 – Shelby (as undisclosed surrogate for Simpson) files a motion to continue the January 23, 2014 hearing, which is granted and the hearing is continued to April 3, 2014; electronic notice of the continuance is sent to Simpson via e-mail;

(xii) January 24, 2014 – Simpson files a motion in her personal chapter 13 case to reduce her monthly plan payments, supported by amended schedules that failed to disclose her recent marriage;

(xiii) April 2, 2014 – Shelby (again as undisclosed surrogate for Simpson) files a motion to continue the rescheduled hearing on the show cause, which the Court denies; electronic notice of the denial is sent to Simpson via email;

(xiv) April 3, 2014 – Shelby files a letter with the Court taking responsibility and stating she was guilty of not informing Simpson of motions and notices (but failed to disclose in the letter that she had not informed Simpson of her wrongdoings);

(xv) April 3, 2014 – Simpson fails to appear at show-cause hearing;

14

(xvi) April 23, 2014 – Court enters an order suspending Simpson from practice; the order is sent electronically via email to Simpson's personal lawyer, in addition to ordinary noticing procedures;

(xvii) Late April through early September 2014 – Simpson is retained by several clients seeking bankruptcy relief, but for whom she cannot file petitions due to her suspension; Shelby feigns filing bankruptcy cases via court electronic filing system;

(xviii) July 1, 2014 – Simpson sends letter to state court judges (not federal courts) advising she will be "unavailable for court scheduling" because she will be attending classes in California on July 11 and August 1, 2014, and will "be out of town intermittently . . . beginning August 7, 2014 through May 18, 2015 for [graduate school] classes in California";

(xix) September 4, 2014 – Shelby informs Simpson of the cover-up;

(xx) September 11, 2014 – Simpson files a motion seeking reinstatement to practice before the Court;

(xxi) October 6, 2014 – Court conducts hearing on Simpson's motion for reinstatement.

<u>Rules of Professional Conduct</u>:

At the conclusion of the hearing, the Bankruptcy Administrator stated his greatest concern with Simpson's fitness to practice was the lack of personal responsibility she was willing to accept for the egregious lack of control in her office since November 2013, in violation of Rule 5.3 of the Alabama Rules of Professional Conduct. The Court shares that concern. Rule 5.3 provides:

15

Case 13-41769-JJR7    Doc 53    Filed 11/20/14    Entered 11/20/14 15:56:28    Desc Main
Document    Page 15 of 18

With respect to a nonlawyer employed or retained by or associated with a lawyer:

> (a) a partner in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer;
>
> (b) a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer . . . .

Rule 5.3, Alabama Rules of Professional Conduct. *See Davis & Goldberg v. Ala. State Bar*, 676 So. 2d 306 (Ala. 1996) (upholding suspension of partners when nonlawyers were allowed to perform legal services such as interviewing clients and preparing filings and "informing" clients about chapter 13 and chapter 7 bankruptcy differences in violation of Rule 5.3); *In the Matter of Phillips*, 244 P.3d 549, 555 (Ariz. 2010) (citing cases wherein attorneys were sanctioned for allowing non-lawyers to function without adequate supervision).

Conclusions:

Simpson's affidavit and testimony at times approached apologetic but she never accepted full responsibility for the conduct of her employee or the lack of control over her law practice. They were replete with references to other parties who were to blame, from Emery, to Shelby, to this Court and its staff, to the mailman. The closing line of her affidavit summarized her lack of understanding of her responsibilities as an attorney: "I realize the clients are victims but I am a victim as well."

Although Simpson maintained she was a victim of Shelby's misconduct, if that were so, she was far from an innocent victim. It is axiomatic that an attorney may not delegate tasks to a nonlawyer employee and escape responsibility for the employee's malfeasance, especially, as

16

was the situation here, when the employee was never properly supervised and her misconduct was allowed to go on for such an extended time. Simpson never took the time to personally review notices from the Court – a simple but important task – thus allowing Shelby to compound and perpetuate the harm she was doing to Simpson's law practice and reputation, and most importantly to Simpson's clients. By giving Shelby an overly free reign, which was tantamount to a *de facto* license to practice law, by failing to independently verify that Shelby's work was in keeping with professional standards, and by not confirming that the information she was receiving from Shelby was accurate and complete, Simpson, herself, failed to comply with standards of professionalism, and allowed the consequences of Shelby's malfeasance, if not crimes, to grow exponentially. Through inattention and flagrant neglect, Simpson was complicit in Shelby's shenanigans that were allowed to go on from November 1, 2013, when Shelby lied to Simpson about Emery's failure to appear at the first 341 meeting, until September 4, 2014, when Shelby finally confessed her misdeeds to Simpson. If Simpson had simply checked her own email notices from time to time, she would have known about Emery's failure to attend the first two 341 meetings and the trustee's motion to dismiss Emery's case, not to mention the Court's show-cause notice and order suspending Simpson from practice.

The hearing on Simpson's motion for reinstatement concluded with an unexpected announcement: Simpson's attorney stated that Simpson did not intend to further practice before this Court. Thus, at this time, the Court will not attempt to determine what Simpson must do to be reinstated. Regardless of Simpson's intent to forego her bankruptcy practice (at least in the Northern District of Alabama), the Bankruptcy Administrator requested the names and contact information of Simpson's clients who were misled, and who were told their bankruptcy cases had been filed during Simpson's suspension. He intends to contact these clients and confirm

17

they received refunds of the attorney fees and filing fees they paid to Simpson. The Bankruptcy Administrator's request is reasonable, and should be allowed.

Order:

Accordingly, it is hereby ORDERED that within 14 days of the entry of this Opinion and Order, Simpson shall provide to the Bankruptcy Administrator a written list of every bankruptcy client and potential client she counseled during her suspension, whether the client ultimately retained her or not. The list shall include, respectively, the clients' or potential clients' names, addresses, telephone numbers, the dates they were counseled, the dates and amounts of payments received, and the dates and amounts of payments refunded. The list shall be attested as complete and accurate by Simpson under oath.[16]

Should Simpson change her mind and wish to again practice before this Court (i.e., any or all of the four divisions of the U. S. Bankruptcy Court for the Northern District of Alabama), she may file a request for reinstatement with this Court (Eastern Division) and therein describe in detail what measures she has taken to ensure that the omissions and unprofessional conduct with respect to her law practice, as discussed above, will not be repeated. In the meantime, it is ORDERED that Simpson's suspension from practice before the U.S. Bankruptcy Court for the Northern District of Alabama shall continue until further order of this Court, and all CM-ECF usernames and passwords issued to Simpson shall be permanently deactivated.

So done and ordered this 20th day of November 2014.

/s/ James J. Robinson
James J. Robinson
U.S. Bankruptcy Judge

---

[16] If Simpson's oath is administered by a notary public, that notary may not be Karen Malone, even if she has regained her commission. *See* note 14 *supra*. And for obvious reasons, Shelby, whom the Court understands is a notary, may not serve as the notary.